# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| EMMA SUE PATE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 1:14-cv-00441-TMP |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

**I.  Introduction**

The plaintiff, Emma Sue Pate, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Ms. Pate timely pursued and exhausted her administrative remedies and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Ms. Pate was nineteen years old at the time of the alleged onset of disability, she has a limited education, and is able to communicate in English. (Tr. at 30).  Her

past work experiences include employment as a fast food worker (light and unskilled) and a cashier/checker (light and semi-skilled). *Id.* Ms. Pate claims that she became disabled on June 1, 2008, due to a gunshot wound to the leg, high blood pressure, bipolar disorder, and slow learning. (Tr. at 30, 130).

When evaluating the disability of individuals over the age of eighteen, the regulations prescribe a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The first step requires a determination of whether the claimant is "doing substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If he or she is, the claimant is not disabled and the evaluation stops. *Id.* If he or she is not, the Commissioner next considers the effect of all of the physical and mental impairments combined. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). These impairments must be severe and must meet the durational requirements before a claimant will be found to be disabled. *Id.* The decision depends on the medical evidence in the record. *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971). If the claimant's impairments are not severe, the analysis stops. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Otherwise, the analysis continues to step three, which is a determination of whether the claimant's impairments meet or equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments fall within this category, he or she will be found disabled without further consideration. *Id.* If he or she does not, a determination of the claimant's residual functional capacity will be made and the analysis proceeds to the fourth step.   20 C.F.R. §§ 404.1520(e), 416.920(e).   Residual functional capacity ("RFC") is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite his or her impairments.   20 C.F.R. § 404.945(a)(1).

The fourth step requires a determination of whether the claimant's impairments prevent him or her from returning to past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant can still do his or her past relevant work, the claimant is not disabled and the evaluation stops. *Id.* If the claimant cannot do past relevant work, then the analysis proceeds to the fifth step. *Id.* Step five requires the court to consider the claimant's RFC, as well as the claimant's age, education, and past work experience, in order to determine if he or she can do other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant can do other work, the claimant is not disabled. *Id.*  The burden is on the Commissioner to demonstrate that other jobs exist which the claimant can perform; and, once that burden is met, the claimant must prove his or her inability

to perform those jobs in order to be found disabled. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

Applying the sequential evaluation process, the ALJ found that Ms. Pate meets the insured status requirements for a period of disability and DIB through September 30, 2010. (Tr. at 19). He further determined that Ms. Pate has not engaged in substantial gainful activity since August 21, 2010. *Id*. According to the ALJ, Plaintiff's gunshot wound to the right buttock, obesity, borderline intellectual functioning, depression and anxiety are considered "severe" based on the requirements set forth in the regulations. (Tr. at 20). He also found that Ms. Pate has the following non-severe impairments: hypertension, history of pelvic inflammatory disease, history of rectal abscess and hemorrhoids, peripheral edema, history of ovarian cyst, constipation, restless leg syndrome, fibromyalgia, scoliosis, pinched nerve in the back and irritable bowel syndrome. *Id*. However, he found that these impairments neither meet nor medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. The ALJ determined that she "has the residual functional capacity to perform medium work as defined in 20 CFR §§ 404.1567(c) and 416.967(c) except that she cannot climb ladders, ropes or scaffolds. She is limited to the performance of simple, routine, repetitive tasks in an environment where changes are infrequent and are gradually

introduced.  The claimant should not interact with the general public.  She can work in close proximity to co-workers, but would do best working on tasks alone." (Tr. at 21-22).

According to the ALJ, Ms. Pate is unable to perform any of her past relevant work[1], she is a "younger individual," and she has a "limited education," as those terms are defined by the regulations.  (Tr. at 30).  He determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills."  *Id*.  Even though Plaintiff cannot perform the full range of medium work, the ALJ used the testimony of the vocational expert as a guideline for finding that there are a significant number of jobs in the national economy that she is capable of performing, such as hand packager, kitchen helper, and day worker, all of which are classified as medium, unskilled work.  (Tr. at 31).  The ALJ concluded his findings by stating that the Plaintiff "has not been under a disability, as defined in the Social Security Act, from June 1, 2008, through the date of this decision."  *Id*.

---

[1] The ALJ noted that the plaintiff was unable to perform her past relevant work as a fast food worker, which was graded by the vocational expert as light and unskilled, and a cashier/checker, which was graded by the vocational expert as light and semi-skilled.  (Tr. at 30).  Although this work is light, and the ALJ determined that the plaintiff was physically able to perform medium work, the vocational expert testified that the plaintiff cannot perform the past work "within the residual functional capacity" which notes that the plaintiff "should not interact with the general public" and "would do best working on tasks alone."  *Id*.

## II. Standard of Review

This Court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The Court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The Court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Id.* "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Federal Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Indeed, even if this Court finds that the evidence preponderates against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400. No decision is automatic, however, for "despite this deferential standard [for

review of claims] it is imperative that the Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the plaintiff meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as there is substantial evidence in the record supporting it.

## III. Discussion

Ms. Pate alleges that the ALJ's decision should be reversed and remanded because, she asserts, the record establishes her disability under listing 12.05(C) of the "Listing of Impairments." The plaintiff argues that the ALJ misapplied listing 12.05(C), and that further proceedings are necessary to properly evaluate whether she meets the listing. She does not challenge any of the ALJ's findings regarding her physical impairments.

Listing 12.05 states, in relevant part:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpart P, app. 1, § 12.05. The introductory material to the mental disorders listing clarifies that to meet the listing, an impairment must satisfy

"the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria" listed in subsections A through D.  20 C.F.R. Part 404, Subpart P, app. 1, § 12.00A (emphasis added).

There are records of two IQ tests administered to the plaintiff.  The first was the Wechsler Intelligence Scale for Children – III, administered when the plaintiff was fifteen years old.  At that time, the plaintiff scored a verbal IQ score of 76, a performance IQ score of 74 and a full scale IQ of 73.  Each of the scores is greater than the score of 60 to 70, which satisfies listing 12.05(C).  During the process of seeking Social Security benefits, however, the Social Security Administration requested that the plaintiff undergo a second IQ test.  The Wechsler Adult Intelligence Scale – IV was administered by Dr. Dana K. Davis, Ph.D., a licensed psychologist.  The plaintiff scored a verbal comprehension index score of 70, a perceptual reasoning index score of 69, a working memory index score of 69, a processing speed index score of 76, and a full scale IQ of 65.

Regarding the plaintiff's IQ score, the ALJ stated that the requirements for listing 12.05 were not met because "the IQ scores of Dr. Davis . . . are not considered valid in view of higher IQ scores from school . . . as well as the claimant's activities of daily living and work history." (Tr. at 21).  The ALJ relied

heavily on the other aspects of Dr. Davis's evaluation of the plaintiff in his finding that the plaintiff has only moderate mental limitations. He states,

> I have assigned great weight to the findings and opinion of the consultative examiner, Dr. Davis who stated it was likely the claimant would be able to work as she had previously had a number of jobs. Dr. Davis stated that the claimant's mental impairment was somewhere between the mild mental retardation and borderline range. On the WAIS, the claimant obtained a full-scale IQ score 65; however, Dr. Davis noted the claimant was able to read simple words, communicate without difficulty and was fairly independent in daily activities. Dr. Davis stated during the interview, the claimant did not described [sic] any symptoms indicating depression, bi-polar disorder or anxiety. In fact, she stated the claimant was quite cheerful and calm.
>
> The undersigned finds that the claimant's abilities are more consistent with borderline intellectual functioning versus mental retardation. As discussed earlier, the diagnostic description of mental retardation reads, 'mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22'. The record notes that school records dated in 2004 when the claimant was in the ninth grade found a full-scale IQ of 7[3]. It is noted that the claimant's full scale IQ of 65 would satisfy the first element in the introductory paragraph (Exhibit B-14F). However, element two then requires deficits in adaptive functioning which is met as long as there are significant limitations in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community services, self-direction, functional academic skills, work, leisure, health and safety (DSM-IV-TR, p. 41). Here the evidence as discussed above supports significant limitation in only functional academics (Exhibit B-2F). Relevant to the other areas of adaptive functioning, the evidence reflects that the claimant has successfully worked as a fast food worker and a cashier/checker. It is noted that the vocational expert graded the work of cashier/checker as

> semi-skilled. Further, Ms. Pate testified that she left this work because of her inability to stand and not because of her mental limitations. She testified she is able to attend church, shop and prepare simple meals. She reported caring for her personal needs independently. These activities fail to demonstrate the deficits in adaptive functioning as required by the core elements of mental retardation and therefore, this impairment is more equivalent to borderline intellectual functioning. The above evidence does not substantiate the level of limitation as alleged by the claimant but the reasonably [sic] limitations as supported are reflected within the residual functional capacity.
>
> I agree with the assessment of the State Agency Mental Health consultant, Dr. Dennis. He opined the claimant was functioning in the borderline intellectual range. He stated she was able to fill out the social security forms that he noted was not consistent with a diagnosis of mental retardation. I find that his assessment further confirms the opinion.

(Tr. at 29).

Appendix 1 to Subpart P of Part 404 states that "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. § 404.1520, Appendix 1 ¶ 12.00(B)(6)(c). Despite the plaintiff's statement that "the lowest of the IQ scores is to be used in determining the presumption of ¶12.05(C)," the guidelines do not require the use of the lowest IQ score ever obtained. The guidelines simply clarify that, when comparing the verbal comprehension index score, perceptual reasoning

index score, working memory index score, processing speed index score, and full scale IQ score, the ALJ is to use the lowest of the scores. The ALJ in the instant case did just that. The ALJ noted that on the WISC-III, the lowest score was the full scale score of 73. Likewise, on the WAIS administered by Dr. Davis, the lowest score was the full scale score of 65. The ALJ properly applied § 404.1520, Appendix 1 ¶ 12.00(B)(6)(c) for each of the two IQ tests before him. He simply rejected the validity of the second test as an accurate indicator of plaintiff's true intelligence.

Furthermore, the Eleventh Circuit has acknowledged that "a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record on the claimant's daily activities and behavior." *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992), citing *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986) (rejecting a claim of section 12.05(C) mental retardation where the claimant's IQ score of 69 was inconsistent with evidence that he had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked in various technical jobs such as an administrative clerk, statistical clerk, and an algebra teacher). Accordingly, even presuming the ALJ had only the IQ score of 65 to consider, he still was entitled to discredit the score if it was incompatible with the record as a whole. The ALJ fully

explained why he determined that the IQ score of 65 was not representative of the plaintiff's actual mental ability. These reasons included the fact that plaintiff had tested higher while in school; that Dr. Davis had expressed the idea that the IQ of 65 probably underestimated plaintiff's true IQ and that she may have been in the low borderline range; that plaintiff had worked for several years without difficulty caused by her mental status; that Dr. Dennis noted that the plaintiff filled out her own activities-of-daily-living form, which would be inconsistent with mental retardation; and that Dr. Dennis opined that plaintiff was functioning in the borderline range, not the mentally retarded range of intelligence. The ALJ explained:

> At the hearing, the representative, Mr. Booker, argued that the claimant's impairments meet the criteria for 12.05C. Mr. Booker argued that the claimant completed ninth grade in special education partially and no GED was obtained. She has not had any vocational training. He stated she is able to do simple reading and needs help preparing forms. Mr. Booker noted the claimant has never had a driver's license but took the test six times. She never had the oral test. Ms. Pate does not have a checkbook or credit card and has never bought insurance. He reported job applications were filled out with the help of the manager. He noted the claimant has never lived independently and has not worked since June 2008.
>
> Mr. Booker's closing statement indicated that school records showed IQ in the low 70s that was the Weschler IQ test for children. He stated the adult version of the test provided basis for 12.05C with full-scale IQ score of 65.

. . .

School records indicated that the claimant was administered the WISC-III intelligence test in May of 2004 and obtained a full scale IQ score of 73 with verbal IQ score of 76 and performance IQ score of 74. She was found eligible to continue to participate in special education classes because of the discrepancy between ability and achievement. The areas of environmental/cultural/economic concerns, mental retardation, emotional disturbances, visual/hearing disabilities and motor disabilities were all ruled out as the primary cause of her impairment. The interpretation of the WISC test noted that her general cognitive ability was in the borderline range with verbal and performance ability scores in the borderline range. It was noted that the claimant was in Algebra classes (Exhibits B-1F and B-2F).

. . .

On April 6, 2011, the claimant underwent a consultative psychological evaluation conducted by Dr. Dana Davis, at the request of the Agency. The diagnostic impressions were mild mental retardation through borderline intelligence and complaints of leg pain. The claimant was administered the Weschler Adult Intelligence Test (WAIS) and obtained a full-scale IQ score of 65. Dr. Davis noted these scores were a little lower than the testing that was completed in the school setting when the claimant's full scale IQ score was 73. She opined that best description, therefore, would be somewhere between the mild mental retardation and borderline range. She noted the claimant was able to read simple words, communicated without difficulty and was fairly independent other than no driver's license. Dr. Davis summarized that the claimant presented with lower than average intelligence. The examiner noted that although the claimant had been diagnosed with major depression, bi-polar disorder and anxiety disorder, she did not describe any symptoms on the evaluation and really was quite cheerful and calm during the interview. Dr. Davis stated the claimant had a number of jobs in the past, she thought it was likely she would be able to work again (Exhibit B-14F).

DDS mental health expert found that the claimant had mental retardation scores but functioning level more like borderline intellectual functioning.  Dr. Larry Dennis stated that claimant filled out her own activities of daily living form that was not likely indicative of mental retardation.  He indicated the claimant had a moderate restriction in the activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace with no episodes of decompensation (Exhibit 15-F).

Dr. Dennis indicated the claimant could understand, remember and carry out short and simple instructions but not detailed instructions.  He noted she could attend to simple tasks for two hours over the eight-hour workday but noted she would require casual supervision and would work best with a well-spaced workstation.  He indicated contact with the general public should be casual and criticism needed to be given in a non-confrontational manner.  The claimant would work best with few familiar co-workers.  He noted changes in the work setting needed to be gradual and infrequent but indicated the claimant could make short-range plans but would need help with long range planning (Exhibit B-17F).

. . .

I find that the claimant has no more than moderate mental limitations.  There is no record that the claimant is currently participating in any mental health treatment.

. . .

I observed at the hearing that the claimant was alert and oriented.  She was able to answer all questions logically and coherently.  There was no indication that the claimant was not attentive and discussed her impairments for almost one hour without hesitation.

In sum, the above residual functional capacity assessment is supported by the medical evidence of record.  I find that the claimant has some mental limitations and have allowed for these restrictions in the

residual functional capacity where she is limited to limited to [sic] the performance of simple, routine, repetitive tasks in an environment where changes are infrequent and gradually introduced. The claimant should not interact with the general public. She can work in close proximity to co-workers, but would do best working on tasks alone.

(Tr. at 23-26, 29-30).

There is no indication that the ALJ failed to properly consider all of the plaintiff's IQ evidence. The ALJ's conclusion that the plaintiff's IQ score of 65 was not valid due to its inconsistency with other evidence in the record and that the plaintiff does not meet the listing of 12.05(C) is supported by substantial evidence.

## IV.  Conclusion

Upon review of the administrative record, and considering all of Ms. Pate's arguments, the Court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered affirming the Commissioner's determination.

DATED this 29th day of June, 2015.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE